IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL ACTION |
| | : | |
| v. | : | NO: 1:11-cr-239-CAP-ECS-21 |
| | : | |
| PEDRO PABLO GOMEZ-RIVERO. | : | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the court on Defendant's motion to suppress evidence. [428]. The motion came on for evidentiary hearing on November 9, 2011. The transcript has been filed. The post-hearing briefs have been submitted. The matter is now ready for a Report and Recommendation on the motion.

**I.
The Facts**

Defendant moves to suppress two cell phones and an identification document seized on June 16, 2011, at an apartment located at 4110 Preston Park Drive in Duluth, Georgia. [T. 4, 36]. Law enforcement officers went to the apartment on that date to arrest Defendant on a federal arrest warrant. [T. 8]. The apartment had been under surveillance for several days prior to the arrest. [T. 30]. The agents had seen Defendant enter the apartment a few minutes before they approached to make the arrest. [Id.]. When they arrived at the apartment and knocked at the door, Defendant answered

the door. He was placed under arrest and handcuffed just outside the doorway. [T. 13-14].

As he was being arrested, Defendant indicated there were children inside the apartment and the officers asked if they could come into the apartment with him to look after the children. [T. 13-14]. Defendant indicated that they could come in and the officers entered and performed what they described as a protective sweep. [T. 15, 26]. As a result of the sweep, they found three children in the apartment, all under the age of eight or nine, whom they brought into the living room. [T. 15].

After the sweep, the agents and Defendant sat in the living room. [T. 16, 26]. Agent Rapp asked Defendant for identification. Defendant indicated that his identification was in his wallet in a back bedroom. Agent Rapp asked if they could get the ID and Defendant acknowledged yes. [T. 17-18]. Agent Rapp then proceeded to the back bedroom with Defendant where Defendant directed the agent to his wallet on a shelf in the bedroom. [T. 17-19, 26, 28-29]. Agent Rapp took Defendant's identification from the wallet and put the wallet back. [T. 19]. They then returned to the living room. [Id.].

Agent Rapp testified that the agents' primary concern after they came into the apartment was to provide arrangements for the children, since Defendant was the only adult in the apartment. [T.

2

19, 25]. One of the older children assisted the agents in calling their mother, Maria Sritavong, who returned to the apartment around 3:30 p.m., within five or 10 minutes of being called. [T. 20]. When the children's mother arrived, the officers asked her if they could search the apartment. [T.20-21]. She agreed and signed a written consent. [Id.].

The agents then searched the apartment and located the two cell phones in question, which were near a television in the living room. [T. 22]. Ms. Sritavong advised the agents that the phones belonged to Defendant. [T. 23]. The agents seized the cell phones and the identification card previously obtained from Defendant's wallet. [T. 22-23, 32]. Agent Rapp testified that he seized the phones because he thought the phones would contain evidence. [T. 23]. He explained that he was aware there was a Title III investigation ongoing that involved wiretaps and that Defendant was the subject of the investigation.[1] [Id.].

---

[1] Agent Rapp also testified that they knew the phones belonged to Defendant because of the telephone numbers on the phones. He was less certain, however, about the details relating to the identification of the telephone numbers. [T. 23]. For example, he did not state when he learned the numbers or whether he knew they were numbers targeted or identified in any wiretaps.

3

## II.
## The Issues

Defendant argues that the agents were not justified in making a protective sweep of the apartment and that the protective sweep was overly broad and unreasonable. See Defendant's Brief at 5-6, [Doc. 483]. Because the protective sweep was overly broad and unreasonably prolonged, Defendant argues that the officers were not authorized to remain in the apartment and that the consent to search they obtained later from Ms. Sritavong was involuntary. See Defendant's Brief at 6-8.

The government argues that the protective sweep was justified by the presence of the children and the officers' legitimate concern for the children's safety if they were left alone upon the arrest of Defendant. See Government Response Brief at 7-8, [Doc. 497]. The government submits that the agents entered the apartment with the consent of Defendant. First, the government says that Defendant consented to the agents' entry to secure the safety of the children, who had no other adult caretaker present. Second, Defendant consented to sitting down in the living room and providing his identification, which he assisted the officers in retrieving from his bedroom and voluntarily surrendered. See id. at 8-10. Finally, the government submits that Ms. Sritavong's consent to search was voluntary and authorized the agents' seizure of the cell phones. Id.

4

## III.
## Discussion

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Maryland v. Buie, 494 U.S. 325, 327 (1990). To engage in a "protective sweep," however, the officers must have "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id. at 334.

In this case Defendant has a colorable argument that the officers would not have had sufficient justification for entering and conducting a protective sweep, absent any articulable facts indicating a safety risk for the officers. The agents had the apartment under surveillance before the arrest and had no knowledge that there was anyone inside who might pose a danger to them. Agent Rapp, the agent who testified at trial, did not point to any articulable facts that would lead a reasonable officer to believe there was any danger to those on the arrest scene from someone inside. His testimony was that, even where the arrestee is encountered outside the apartment, it was standard operating

5

procedure to go into the residence and go through the rooms to "clear" the area. [T. 6, 25].

The evidence at the hearing did show, however, that Defendant voluntarily permitted the agents to come into the apartment, at least in part motivated by his concern for the children who would be left unchaperoned if he was arrested and taken away. The evidence also showed that the officers were concerned for the safety and welfare of the children, once they were advised that they were inside and that Defendant was the only adult present. Thus, the undersigned concludes that the officers' entry to the apartment after the arrest of Defendant was legitimate, based upon the consent of Defendant and the officers' knowledge that there were children in the apartment who would be left without supervision if Defendant were to be arrested.

Once the officers were inside, the circumstances were different. Aware that children were in the apartment, the officers conducted their sweep and rounded up the children into the living room. While this round-up might not have been justified as a protective sweep on traditional officer safety grounds, it was not unreasonable under the circumstances. Indeed, if the officers had taken Defendant away to jail and left the children there alone, the safety of the children might very well have been in question. Furthermore, nothing was seized during the sweep and the sweep was

6

apparently limited to rousting out the children and bringing them to the living room. Defendant did not object to these actions and appears to have consented, implicitly if not explicitly.

Thereafter, when asked about his identification, it appears that Defendant voluntarily consented to assisting the agents in retrieving his wallet so that he could produce his identification. The agents then stayed in the apartment until the mother of the children came to take charge of them. The mother, Ms. Sritavong, showed up at the apartment only five to 10 minutes after she was called, only 30 minutes after the officers arrived. None of these actions by the officers were unreasonable, under the circumstances, and none of these actions were objected-to by Defendant.

Defendant attempts to relate the allegedly unjustified sweep to the alleged invalidity of the consent obtained later from Mrs. Sritavong, contending that the former tainted the latter. The two events – the sweep and the consent – are not so fatally intertwined. Ms. Sritavong was not under arrest or restrained in any way when she gave her consent. She arrived after the officers were already inside and she gave written consent, acknowledging that she had not been threatened or coerced. See Government Exhibit 2. She did not testify

7

at the hearing and there is no evidence that her consent was not free and voluntary.[2]

The fact that the officers had already conducted a sweep, which was limited and resulted in no seizure of evidence or contraband, did not taint the voluntariness of Ms Sritavong's consent, even if the sweep could be found to be illegal. Ms. Sritavong was not present when the sweep occurred, and there is no evidence she even knew about the earlier sweep. Even if the entry and sweep could be found to be illegal, the government's conduct cannot to be said to have been flagrant or designed for the purpose of gaining consent. See United States v. Delancy, 502 F.3d 1297, 1313-14 (11th Cir. 2007) (illegal entry and protective sweep did not taint third-party homeowner's consent).

## IV.
## Conclusion

By the terms of its text, the reasonableness of any search and seizure is the ultimate gauge for measuring compliance with the

---

[2] Although not raised as an issue, it appears Ms. Sritavong had actual and apparent common authority over the premises as one of the residents of the apartment upon which the police could reasonably rely in obtaining consent. See Illinois v. Rodriquez, 497 U.S. 177, 181, 185-86 (1990); United States v. Matlock, 415 U.S. 164, 171 (1974). Furthermore, Georgia v. Randolph, 547 U.S. 103, 122-23 (2006), cited by Defendant in his reply brief, does not apply because Defendant was present during the search request yet never expressly refused consent despite the consent given by Ms. Sritavong.

8

Fourth Amendment. As the Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable* searches and seizures, shall not be violated . . . ." U.S. CONST. amend. IV (emphasis added). See also Delaware v. Prouse, 440 U.S. 648, 653–654 (1979) ("The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials . . . ."). In this case, nothing that Defendant has pointed to suggests unreasonable conduct by the officers. To the contrary, the search and seizure of the cell phones and identification card were made pursuant to valid consent and were reasonable.[3] No violation of Defendant's Fourth Amendment rights appears on the evidentiary record in this case. Accordingly, the motion to suppress should be **DENIED**.

It appearing that there are no further pretrial or discovery matters to bring before the undersigned as to this defendant, it is

---

[3] Ms. Sritavong granted consent to search, but the actual seizure was presumably based upon the officers' recognition of the apparent evidentiary character of the cell phones and the ID card, justifying their seizure under the plain view doctrine. See Horton v. California, 496 U.S. 128, 136-37 (1990); United States v. Hromada, 49 F.3d 685, 690 (11th Cir. 1995). Defendant has not raised any issue about the validity of the *seizure* of the phones or identification document as evidence, as opposed to the *search* conducted to find them. Cf. Arizona v. Hicks, 480 U.S. 321, 324 (1987) (stolen character of stereo components not apparent under plain view doctrine until after they were moved to view serial numbers).

AO 72A
(Rev.8/82)

therefore **ORDERED** that this defendant be and is hereby **CERTIFIED** as ready for trial.[4]

**SO REPORTED AND RECOMMENDED**, this 20th day of January, 2012.

s/ *E. Clayton Scofield*
E. CLAYTON SCOFIELD III
UNITED STATES MAGISTRATE JUDGE

---

[4] This Court observes that this defendant has been indicted with a additional defendants and that matters pertaining to such co-defendants are still pending. Pursuant to 18 U.S.C. §3161 (h)(7) (the Speedy Trial Act), the time for commencing the trial of these defendants may be stayed until such time as all defendants have been certified ready for trial. Hence, it is not necessary to place the above-named defendant's case on the calendar for trial at this time.

10